**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANTHONY JACKSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERCADIEN, P.C., CPAS and 1ST BANK OF SEA ISLE CITY CORPORATION,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Anthony Jackson ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this class action Complaint against Defendants Mercadien, P.C., CPAs ("Mercadien") and 1st Bank of Sea Isle City Corporation (1st Bank) (collectively, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Defendant Mercadien is a professional services firm providing advisory, tax, accounting, and mergers and acquisitions services to a diverse client base across the United States and Europe.[1]

3. Defendant 1st Bank is a financial institution offering deposit, lending, and other financial services, with branches throughout New Jersey.[2]

4. As such, Defendants store a litany of highly sensitive personal identifiable information ("PII") about their customers. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems, resulting in the data breach (the "Data Breach").

5. Defendant 1st Bank retained Defendant Mercadien[3], a professional services firm providing advisory, tax, accounting, and mergers and acquisitions services, to perform services involving the collection, storage, and/or processing of Plaintiff's and Class Members' PII.[4] On or about November 7, 2025, Defendant

---

[1] *About Us*, MERCADIEN, https://www.mercadien.com/outstanding-cpa-advisory-services/about-us/ (last visited June 26, 2026).
[2] *About Us*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/about-us (last visited June 23, 2026).
[3] *From Our News Room*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/from-our-news-room (last visited June 23, 2026).
[4] *About Us*, MERCADIEN, https://www.mercadien.com/outstanding-cpa-advisory-services/about-us/ (last visited June 23, 2026).

Mercadien discovered it had been hacked in the Data Breach that compromised sensitive information entrusted to it by Defendant 1st Bank.[5]

6. Defendants required Plaintiff and Class Members to provide their PII in order to obtain services from, or maintain a relationship with, Defendants. By collecting and maintaining this information, Defendants assumed a duty to safeguard Plaintiff's and Class Members' PII and to ensure that any third-party vendor entrusted with such information, including Defendant Mercadien, implemented and maintained reasonable data security measures. Defendants were responsible for protecting Plaintiff's and Class Members' PII from unauthorized access, disclosure, and misuse and for ensuring that such information was stored in a secure manner.

7. It is unknown for precisely how long cybercriminals had access to Defendants' network and/or entrusted PII before the Data Breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of its or its third-party vendor's systems—thereby allowing cybercriminals unrestricted access to its customers' PII.

8. On information and belief, cybercriminals were able to breach the systems of Defendants' because Defendants failed to adequately train their

---

[5] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4d8d003f-1b63-4f61-8564-32582d217590.html (last visited Feb. 24, 2026).

employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII, including when entrusted to vendors. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

9. Plaintiff is a Data Breach victim. He brings this class action on behalf of himself and all others harmed by Defendants' misconduct.

10. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, Defendants' customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

11. Plaintiff Anthony Jackson is a natural person and a citizen of Upper Township, New Jersey. He is domiciled in New Jersey, where he intends to remain.

12. Defendant Mercadien is a limited liability company incorporated in New Jersey and with its principal place of business at 3625 Quakerbridge Road, Hamilton, New Jersey 08619.

13. Defendant 1st Bank is a domestic profit corporation formed under the laws of New Jersey, with its principal place of business at 4301 Landis Ave, Sea Isle City, New Jersey 08243.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one member of the putative Class is a citizen of a state different from Defendants. And there are over 100 putative Class Members.

15. This Court has personal jurisdiction over Defendants because they are headquartered in New Jersey, regularly conduct business in New Jersey, and have sufficient minimum contacts in New Jersey.

16. Venue is proper in this Court because Defendants' principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Defendants Collected and Stored the PII of Plaintiff and the Class***

17. Defendant Mercadien is a professional services firm providing advisory, tax, accounting, and mergers and acquisitions services to a diverse client base across the United States and Europe.[6]

---

[6] *About Us*, MERCADIEN, https://www.mercadien.com/outstanding-cpa-advisory-services/about-us/ (last visited June 26, 2026).

18. Defendant 1st Bank is a financial institution offering deposit, lending, and other financial services, with branches throughout New Jersey.[7]

19. As part of their business, Defendants receive and maintain the PII of thousands of their customers.

20. In collecting and maintaining their customers' PII, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. Plaintiff and Class Members provided their PII to Defendants with the reasonable expectation and mutual understanding that Defendants would safeguard their PII against unauthorized disclosure.

21. Under state and federal law, businesses like Defendants' have duties to protect their customers' PII and to notify them about breaches.

22. Defendant Mercadien recognizes these duties, declaring in its "Privacy Policy" that:

a. "Our policy is not to share personally identifiable information with third parties, unless required by law, or unless explicitly requested by a visitor."[8]

---

[7] *About Us*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/about-us (last visited June 23, 2026).
[8] *Privacy Policy*, MERCADIEN, https://www.mercadien.com/privacy/ (last visited June 26, 2026).

b. "We recognize that your information is valuable and we take all reasonable measures to protect your information while it is in our care."[9]

c. "Mercadien is committed to protecting your privacy and developing technology that gives you the most powerful and safe online experience."[10]

23. Defendant 1st Bank recognizes these duties, declaring in its "Privacy Policy" that:

a. "Federal law also requires us to tell you how we collect, share, and protect your personal information."[11]

b. "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[12]

c. "State laws and individual companies may give you additional rights to limit sharing."[13]

---

[9] *Id.*
[10] *Id.*
[11] *Privacy Policy*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/privacy-policy (last visited June 23, 2026).
[12] *Id.*
[13] *Id.*

***Defendants' Data Breach***

24. Despite their representations in their Privacy Policies, Defendants failed to adequately protect Plaintiff's and Class Members' PII, including when Defendant 1st Bank shared PII with Defendant Mercadien without ensuring that the third-party vendor enacted appropriate and reasonable cybersecurity measures.

25. Defendant Mercadien "provided advisory services for 1st Bank of Sea Isle City in early 2024 and in the course of that work was in possession of data pertaining to some of [their] customers."[14]

26. On or around November 7, 2025, Defendant Mercadien discovered it had been hacked in the Data Breach.[15]

27. Worryingly, Defendant Mercadien's investigation revealed that on or about September 17, 2025, it was hacked in the Data Breach, and "The elements of personal information that may have been impacted as a result of this incident varies per individual and potentially included: names, addresses, dates of birth, driver's license/Government ID numbers, Social Security numbers, and financial account information," and "for a limited number of individuals, the affected information may

---

[14] *From Our News Room*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/from-our-news-room (last visited June 23, 2026).

[15] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4d8d003f-1b63-4f61-8564-32582d217590.html (last visited Feb. 24, 2026).

have included: usernames and passwords, IRS pin numbers, and/or payment card information."[16]

28. On June 5, 2026, Defendant 1st Bank represented that it was "recently" informed of its service provider, Mercadien's, Data Breach, and that it is "in the process of preparing formal notices for our customers whose data may have been impacted. Such notices will be mailed in the coming weeks."[17]

29. Because of Defendants' Data Breach, at least the following types of PII may have been compromised:

a. Name;

b. Address;

c. Date of birth;

d. Driver's license/government ID number;

e. Social Security number; and

f. Financial account information.

30. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative Class can be ascertained from information in Defendants' custody and control. And upon information and belief,

[16] *Id*.

[17] *From Our News Room*, 1st BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/from-our-news-room (last visited June 23, 2026).

the putative Class is over one hundred members—as it includes Defendants' customers.

31. And yet, Defendant Mercadien waited over until December 1, 2025, before it began notifying the class—a full 75 days after the Data Breach began.[18]

32. Defendant 1st Bank has failed to begin notifying the Class.

33. Upon information and belief, Defendant 1st Bank has yet to send individualized notice letters to victims of the Data Breach and does not have mailing information for all individuals who are victims of the Data Breach.

34. Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

35. And when Defendant Mercadien did notify Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class that, "Mercadien encourages you to always remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information."[19]

[18] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/4d8d003f-1b63-4f61-8564-32582d217590.html (last visited Feb. 24, 2026).

[19] *The Mercadien Group Issues Notice of Data Security Incident*, MERCADIEN, https://www.mercadien.com/notice/ (last visited Feb. 24, 2026).

36. Defendant 1st Bank's website post acknowledging the Breach also fails to provide the consolation Plaintiff and Class Members seek and certainly falls far short of eliminating the substantial risk of fraud and identity theft Plaintiff and the Class now face.[20]

37. Plaintiff's and Class Members' information is likely for sale on the dark web. Their PII could also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and/or Class Members. Either way, unauthorized individuals can easily access and misuse the PII of Plaintiff and Class Members.

38. Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

39. Since the Data Breach, Defendant Mercadien claims that it "promptly launched an investigation, reported the incident to law enforcement and engaged a national cybersecurity firm to assist in assessing the scope of the incident and took steps to mitigate the potential impact to the community."[21]

---

[20] *From Our News Room*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/from-our-news-room (last visited June 23, 2026).
[21] *The Mercadien Group Issues Notice of Data Security Incident*, MERCADIEN, https://www.mercadien.com/notice/ (last visited Feb. 24, 2026).

40. Defendant 1st Bank claims that "1st Bank's own systems and data infrastructure were not impacted in this incident. This event was limited to the vendor's environment."[22]

41. But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

42. Defendant 1st Bank also states that "[a]lthough the full scope of the data security incident is still being determined, we understand that data pertaining to some of our customers may have been impacted," acknowledging that the Data Breach created a present, continuing, and significant risk.[23]

43. Further, Defendant Mercadien's Notice and Defendant 1st Bank's website posting show that Defendants cannot—or will not—determine the full scope of the Data Breach, including precisely what information was accessed or when such access occurred within the third-party provider's systems.

44. Defendants have done little to remedy the Data Breach. True, Defendant Mercadien has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly

---

[22] *From Our News Room*, 1ST BANK OF SEA ISLE CITY, https://www.1stbankseaisle.com/about-us/from-our-news-room (last visited June 23, 2026).
[23] *Id*.

insufficient to compensate Plaintiff and Class Members for the injuries that Defendants inflicted upon them.

45. Because of Defendants' Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***Plaintiff's Experiences and Injuries***

46. Plaintiff Anthony Jackson has been a client of Defendant 1st Bank for more than twenty (20) years and remains a current client.

47. Thus, Defendants collected, obtained, and maintained Plaintiff's PII—by Defendant 1st Bank providing or entrusting such information to its third-party providers, including Defendant Mercadien.

48. As a result of Defendants' failure to adequately safeguard Plaintiff's PII, including while entrusted to third-party providers, Plaintiff was injured by Defendants' Data Breach.

49. Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

50. Plaintiff provided his PII to Defendant 1st Bank and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law, including when the PII was shared

with Defendant Mercadien. Defendants obtained and continue to maintain Plaintiff's PII. Defendants have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure, including when entrusted to third-party vendors.

51. Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

52. Through their Data Breach, Defendants compromised Plaintiff's PII.

53. Plaintiff has *already* suffered—whereby in early 2026, Plaintiff received a notice that his name, address, and date of birth were found on the dark web.

54. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

55. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

56. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls. Plaintiff attributes these unsolicited communications to the Data Breach based on temporal proximity, his careful handling of PII, and the fact that these unsolicited communications are atypical in Plaintiff's experience.

57. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

58. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

59. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

60. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

61. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because of the Data Breach, which exposed Plaintiff's PII to third parties and placed it right in the hands of criminals.

62. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try to mitigate his injuries.

63. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

64. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[24] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[25]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[26]

c. 89% of consumers stated that "I care about data privacy."[27]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[28]

---

[24] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[25] *Id*. at 3.
[26] *Id*.
[27] *Id*. at 9.
[28] *Id*.

e. 51% of consumers revealed that “I have switched companies or providers over their data policies or data-sharing practices.”[29]

f. 75% of consumers stated that “I will not purchase from organizations I don’t trust with my data.”[30]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

65. Because of Defendants’ failure to adequately safeguard Plaintiff’s and Class Members’ PII, including while entrusted to a third-party provider, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing,

---

[29] *Id*.
[30] *Id*. at 11.

detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendants' possession—and is thus at risk for future breaches so long as Defendants fails to take appropriate measures to protect the PII.

***Substantially Increased Risk of Identity Theft and Fraud***

66. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

67. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

68. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

69. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

70. The "dark web" is an unindexed layer of the internet that requires special software or authentication to access.[31] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

71. The unencrypted PII of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for

[31] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[32] *Id*.

targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII.

72. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

73. In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

74. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[33] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[34]

---

[33] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[34] *Id.*

75. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

76. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[35]

77. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

78. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier

[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

79. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

80. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant issued in the victim's name.[36]

---

[36] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

81. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[37] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

82. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information, such as emails, phone

[37] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

numbers, or credit card numbers, may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

83. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

84. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendants failed to rapidly report to Plaintiff and the Class that their PII was stolen. Defendants' failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

---

[38] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

85. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

86. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

87. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

88. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

89. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over

year).[39]

90. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[40]

91. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

***Defendants Could Have Prevented the Data Breach***

92. Data breaches are preventable.[41] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

---

[39] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[40] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[41] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[42]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[43]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [44]

93. Defendants could and should have prevented the Data Breach by ensuring both it and its vendor protected the files and servers containing Plaintiff's and Class Members' PII and were properly secured and encrypted but failed to do so.

94. Defendants failed to take, and failed to ensure its third-party vendor took, the necessary precautions required to safeguard and protect Plaintiff's and

[42] *Id.* at 17.
[43] *Id.* at 28.
[44] *Id.*

Class Members' PII from unauthorized access and exploitation.

***Defendants Failed to Follow FTC Guidelines***

95. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices.

96. According to the FTC, the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendants—should use to protect against unlawful data exposure.

97. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[45] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

[45] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

98. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

99. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

100. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from

these actions further clarify the measures businesses must take to meet their data security obligations.

101. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to its customers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

102. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants'. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

103. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

104. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards

of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

105. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

***Defendants Failed to Comply with the Gramm-Leach-Bliley Act***

106. Defendants are financial institutions, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus are subject to the GLBA.

107. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

108. Defendants collect nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendants were subject to the

requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and are subject to numerous rules and regulations promulgated on the GLBA statutes.

109. The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

110. Accordingly, Defendants' conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

111. Both the Privacy Rule and Regulation P require financial institutions to provide consumers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic

personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendants violated the Privacy Rule and Regulation P.

112. Upon information and belief, Defendants failed to provide annual privacy notices to consumers after the relationship ended, despite retaining these consumers' PII and storing that PII on Defendants' network systems.

113. Defendants failed to adequately inform their consumers that they were storing and/or sharing, or would store and/or share, the consumers' PII on an insecure platform, accessible to unauthorized parties, and would do so after the relationship ended.

114. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of consumer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying

reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of consumer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

115. As alleged herein, Defendants violated the Safeguards Rule.

116. Defendants failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of consumer information.

117. Defendants violated the GLBA and their own policies and procedures by sharing the PII of Plaintiff and Class Members with a non-affiliated third party without providing Plaintiff and Class Member (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

## CLASS ACTION ALLEGATIONS

118. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach affecting Defendants on or around September 17, 2025, including all those individuals who received notice of the Data Breach.

119. Excluded from the Class are Defendants, its affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

120. Plaintiff reserves the right to amend the Class definition.

121. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

122. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control.

123. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least hundreds of members.

124. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same unreasonable manner of notifying individuals about the Data Breach.

125. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

126. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants was negligent in maintaining, protecting, and securing PII;

d. if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

127. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

128. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

129. Defendants solicited, gathered, and stored the PII of Plaintiff and Class Members, which was in turn provided to Defendants' third-party service providers so that the service providers could provide technology services to Defendants. Plaintiff and the Class entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

130. By collecting and maintaining sensitive PII, Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security or ensure that its third-party vendor(s) did so—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

131. Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed. Defendants had a duty to Plaintiff and Class Members to exercise reasonable care in selecting, monitoring, and ensuring any technology

service providers they hired used adequate data security, procedures, and protocols to prevent foreseeable harm to Plaintiff and the Class.

132. Defendants had a common law duty to exercise reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when selecting a technology provider. This duty included taking action to ensure Defendants' service providers adequately safeguarded such data, that Defendants' service providers were aware of their security requirements, and that Defendants' service providers implemented security requirements to meet federal and state law requirements. Defendants utterly failed to do any of the above.

133. Defendants were also responsible for providing timely notification of the Data Breach to Plaintiff and Class Members, but failed to do so.

134. Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' PII.

135. Defendants owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

136. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

137. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII that it was no longer required to retain under applicable regulations.

138. Defendants knew or reasonably should have known that the failure to exercise due care in the collection, storage, and use of Plaintiff's and Class Members' PII—including when such information was entrusted to third-party providers—involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

139. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendants.

140. Similarly, and as described *supra*, Defendants violated their duties under the GLBA, 15 U.S.C. § 6809(3)(A) which constitutes negligence.

141. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII —whether by malware or otherwise.

142. PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

143. Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

144. Defendants breached these duties as evidenced by the Data Breach.

145. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

a. disclosing and providing access to this information to unauthorized third parties; and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

146. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members, which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

147. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

148. Defendants have admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

149. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer

damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

150. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

151. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

152. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

153. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

154. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive PII.

155. Defendants breached their respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

156. Defendants failed to ensure that their third-party vendors followed applicable FTC guidelines and industry standards for safeguarding and protecting the PII of Plaintiff and Class Members against unauthorized disclosures to third parties.

157. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

158. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

159. But for Defendants' wrongful and negligent breach of their duties owed, Plaintiff and Class Members would not have been injured.

160. The injury and harm suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet those duties, including in safeguarding PII entrusted to third-party providers, and that such failures would cause Plaintiff and Class Members to suffer the foreseeable harms associated with the exposure of their PII.

161. Similarly, and as described *supra*, Defendants violated their duties under the GLBA, 15 U.S.C. § 6809(3)(A), which constitutes negligence *per se*.

162. Defendants' various violations and their failure to comply with applicable laws and regulations constitute negligence *per se*.

163. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

164. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

165. Plaintiff and Class Members entered into relationships with Defendants—and/or were third-party beneficiaries of contracts with Defendants—and, in connection with those relationships, provided their PII to Defendants. In turn, Defendants provided Plaintiff's and Class Members' PII to Defendants' third-party service providers.

166. Plaintiff and Class Members were required to provide their PII to Defendants as a condition of receiving services provided by Defendants. Plaintiff and Class Members provided their PII to Defendants and/or its third-party agents in exchange for Defendants' services, with the reasonable expectation and mutual understanding that Defendants would safeguard their PII from unauthorized disclosure.

167. To the extent Defendants entered into agreements with third-party service providers in connection with the provision of services and benefits, Plaintiff and Class Members were intended third-party beneficiaries of those agreements.

168. Plaintiff and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures, including in connection with any third-party service providers, to protect their PII.

169. Plaintiff and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide, including when such information was processed or stored by third-party service providers, based on Defendants' duties under state and federal law and their internal policies.

170. Plaintiff and the Class Members accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for services.

171. In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

172. In its Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiff's and Class Members' PII.

173. Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

174. After all, Plaintiff and Class Members would not have entrusted their PII to Defendants or their third-party agents in the absence of such an agreement with Defendants.

175. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

176. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

177. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

178. Defendants materially breached the contracts they entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

179. In these and other ways, Defendants violated their duty of good faith and fair dealing.

180. Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

181. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

182. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

183. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

184. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

185. Defendants owed a duty to their customers, including Plaintiff and the Class, to keep this information confidential.

186. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

187. The intrusion was into a place or thing that was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

188. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

189. Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew their own and/or their service provider's information security practices were inadequate.

190. Defendants acted with a knowing state of mind when they failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

191. Acting with knowledge, Defendants had notice and knew that their own and their service provider's inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

192. As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

193. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

194. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII is still maintained by Defendants with their inadequate cybersecurity system and policies.

195. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

196. In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants,

the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**<u>FIFTH CAUSE OF ACTION</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

197. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

198. This claim is pleaded in the alternative to the breach of implied contract claim.

199. Plaintiff and Class Members conferred a benefit upon Defendants. After all, Defendants benefitted from (1) using their PII to provide services, and (2) accepting payment.

200. Defendants appreciated or had knowledge of the benefits they received from Plaintiff and Class Members.

201. Plaintiff and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide, including when such information was processed or stored by third-party service providers, based on Defendants' duties under state and federal law and their internal policies.

202. Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

203. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

204. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) payment because Defendants failed to adequately protect their PII.

205. Plaintiff and Class Members have no adequate remedy at law.

206. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## SIXTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

207. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

208. Given the relationship between Defendants and Plaintiff and Class Members, where Defendants became guardian of Plaintiff's and Class Members' PII, Defendants became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

209. Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

210. Because of the highly sensitive nature of the PII, Plaintiff and Class Members would not have entrusted Defendants, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices, including when such information was processed or stored by third-party service providers.

211. Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII, including when such information was processed or stored by third-party service providers.

212. Defendants also breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

213. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## SEVENTH CAUSE OF ACTION
**Breach of Confidence**
**(On Behalf of Plaintiff and the Class)**

214. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

215. Plaintiff and Class Members disclosed their highly sensitive PII to Defendants in confidence—with the implicit and explicit understanding that Defendants would collect, store, and protect their PII (and *not* allow the disclosure of their PII to unauthorized third parties).

216. As such, by obtaining (and continuing to maintain) Plaintiff's and Class Members' PII, Defendants assumed an obligation to maintain the confidentiality of that PII.

217. At all times during the relationship between Defendants and Plaintiff and Class Members, Defendants were fully aware of the highly confidential nature of Plaintiff's and Class Members' PII.

218. Thus, Defendants intentionally, knowingly, and/or negligently committed the tort of breach of confidence by, *inter alia*:

a. failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII, including when such information was processed or stored by third-party service providers;

b. failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period;

c. and via the numerous instances of misconduct detailed *supra*.

## **EIGHTH CAUSE OF ACTION**
## **Violation of the New Jersey Consumer Fraud Act**
## **N.J.S.A. §§ 56:8 *et seq***
## **(On Behalf of Plaintiff and the Class)**

219. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

220. Defendants violated the New Jersey Consumer Fraud Act by, *inter alia*:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous

cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and industry standards, which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and industry standards.

221. The New Jersey Consumer Fraud Act defines merchandise as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. § 56:8-1(c).

222. At all relevant times, Defendants advertised and sold services that are merchandise within the meaning of the New Jersey Consumer Fraud Act.

223. Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

224. Defendants intended to mislead Plaintiff and Class Members and induce them to rely on its omissions.

225. Had Defendants disclosed to Plaintiff and Class Members that its and/or its service provider's data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business without adopting reasonable data security measures and complying with the law. Defendants accepted the PII that Plaintiff and Class Members entrusted to them while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendants' omissions and representations in their privacy policy, the truth of which they could not have discovered through reasonable investigation.

226. Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights.

227. Under the New Jersey Consumer Fraud Act, the following qualify as unlawful practice:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any

> material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2.

228. In enacting the Identity Theft Prevention Act ("ITPA"), N.J.S.A. 56:8-161 to -166.3, which among other things, amended the New Jersey Consumer Fraud Act, the New Jersey Legislature found that "[i]dentity theft is an act that violates the privacy of our citizens and ruins their good names: victims can suffer restricted access to credit and diminished employment opportunities, and may spend years repairing damage to credit histories." N.J.S.A. § 56:11-45.

229. At all relevant times, Defendants conducted business in New Jersey and collected PII from New Jersey residents within the meaning of the ITPA.

230. Defendants violated the ITPA by failing to disclose the Data Breach in the most expedient time possible and without unreasonable delay to: (i) customers, (ii) the New Jersey State Police, and (iii) Consumer Reporting Agencies, in violation of N.J.S.A. 56:8-163(a), N.J.S.A. 56:8-163(c)1, and N.J.S.A. 56:8-163(f).

231. Defendants' failure to safeguard PII and their promises to do so constitute an unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation because Defendants knew that it and/or its service provider had not adopted adequate electronic or physical safeguards to

protect PII. More specifically, Plaintiff alleges that Defendants failed to implement and maintain reasonable security practices to protect PII, failed to store PII in a way that maximized its security and confidentiality, and permitted or failed to prevent the disclosure of PII.

232. Plaintiff and Class Members had a reasonable expectation that their PII would be protected and the failure to do so constitutes an unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation in violation of N.J.S.A. § 56:8-2.

233. Defendants had a duty to advise Plaintiff and Class Members that its data security was inadequate, including when such information was processed or stored by third-party service providers, and by not doing so, concealed, suppressed, or omitted material facts.

234. Defendants intended for Plaintiff and the members of the proposed Class to rely upon the concealment, suppression, or omission of material fact relating to its data security, including when such information was processed or stored by third-party service providers.

235. Plaintiff and Class Members had a reasonable expectation that data security was adequate when they provided their PII to Defendants.

236. Plaintiff and Class Members would not have conducted business with or provided their PII as required to Defendants if it had not concealed, suppressed, or omitted the material fact relating to its data security.

237. Defendants' actions constitute a knowing, concealment, suppression, or omission in violation of N.J.S.A. § 56:8-2. As a result of the foregoing, Plaintiff and Class Members suffered and will continue to suffer ascertainable losses and other damages as described in detail herein and are entitled to treble damages as provided by N.J.S.A. § 56:18-19.

238. Further, Defendants failed to destroy stale records in violation of N.J.S.A. § 56:8-162, which requires that a business "destroy, or arrange for the destruction of, a customer's records within its custody or control containing personal information, which is no longer to be retained by the business or public entity, by shredding, erasing, or otherwise modifying the personal information in those records to make it unreadable, undecipherable or nonreconstructable through generally available means." N.J.S.A. § 56:8-162.

239. The New Jersey Consumer Fraud Act provides that it is "an unlawful practice and a violation of P.L. 1960, c. 39 (c. 56:8-1 *et seq*.) to willfully, knowingly or recklessly violate" Sections 56:8-161-164 of that Act.

240. In violation of N.J.S.A. § 56:8-162, Defendants retained its former patients or customers' PII in an unprotected and unsecure manner.

241. There are technologies available and programs that can be implemented that automatically wipe information when an event occurs, ending the individual's relationship with the entity at issue. Because Defendants failed to employ any technologies to protect or destroy the PII at issue, it has violated § 56-8-162 of the New Jersey Consumer Fraud Act.

242. As a result of the foregoing, Plaintiff and Class Members suffered and will continue to suffer ascertainable losses and other damages as described herein and are entitled to treble damages as provided by N.J.S.A. § 56:18-19.

243. In addition, Defendants failed to expediently notify victims following the Data Breach in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 *et seq*.

244. Section 56:8-163 of the New Jersey Consumer Fraud Act requires that a business conducting business in New Jersey:

> shall disclose any breach of security of those computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person. The disclosure to a customer shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection c. of this section, or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

N.J.S.A. § 56:8-163.

245. The New Jersey Consumer Fraud Act defines a breach of security as follows:

> "Breach of security" means unauthorized access to electronic files, media or data containing personal information that compromises the security, confidentiality or integrity of personal information when access to the personal information has not been secured by encryption or by any other method or technology that renders the acquisition of personal information by an employee or agent of the business for a legitimate business purpose is not a breach of security, provided that the personal information is not used for a purpose unrelated to the business or subject to further unauthorized disclosure.

N.J.S.A. § 56:8-161. The Data Breach constituted a breach of security.

309. Defendants' disclosure regarding the Data Breach to Plaintiff and Class Members is delayed and not made in the most expedient time possible.

310. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

311. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the dark web.

312. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by the law.

## NINTH CAUSE OF ACTION
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

246. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

247. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

248. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

249. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continue to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to protect the data entrusted to them; and

d. Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiff and Class Members.

250. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

251. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

252. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

253. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

254. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendants from further unfair and/or deceptive practices;

E. Awarding Plaintiff and the Class damages, including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: June 29, 2026

Respectfully submitted,

/s/ Jason H. Alperstein
James E. Cecchi
Jason H. Alperstein
**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100

Fax: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Plaintiff and Proposed Class*
**Pro Hac Vice to Be Filed*